# UNITED STATES DISTRICT COURT
### for the
### Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>44 Wendy Court, Kernersville, North Carolina | ) ) ) ) ) ) | Case No. **1:23 MJ 421** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

(See attachment A)

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

(See attachment B)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 | Conspiracy to distribute a controlled substance |
| 18 USC 1956 and 1957 | Conspiracy to launder money |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*/s/ Bradley Smith*
*Applicant's signature*

_____
Bradley Smith, SPECIAL AGENT, DEA
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____ 10/03/2023 _____

_____
*Judge's signature*

City and state: _____ Winston-Salem, NC _____

Joi E. Peake, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE
SEARCH OF:
1370 GLENWOOD ROAD,
KERNERSVILLE, NORTH
CAROLINA AND
44 WENDY COURT,
KERNERSVILLE, NORTH
CAROLINA AND ALL
OUTBUILDINGS ON OR WITHIN
THE CURTILAGE OF THE
PROPERTIES.

Case No. 1:23 MJ 421

## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

I, Bradley Smith, Special Agent of the Drug Enforcement
Administration ("DEA"), being duly sworn, depose and state that:

## I. INTRODUCTION

A.    Purpose of Affidavit

1.    I make this affidavit in support of an application under Rule 41 of
the Federal Rules of Criminal Procedure for a warrant to search the
premises, outbuildings, and curtilage of the locations known as:

a.     1370 Glenwood Road, Kernersville, North Carolina ("TARGET ADDRESS 1"), within the Middle District of North Carolina, further described in Attachment A, for the things described in Attachment B;

b.     44 Wendy Court, Kernersville, North Carolina ("TARGET ADDRESS 2"), within the Middle District of North Carolina, further described in Attachment A, for the things described in Attachment B;

B.     Agent Background

2.     I am a Special Agent with the DEA and have been since 2010. During my employment as a law enforcement officer, I have received training in narcotics enforcement and investigative techniques, including 19 weeks of specialized training at the DEA academy in Quantico, Virginia. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Special Agent involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, undercover agent, and contact agent for confidential sources. On numerous occasions, I have interacted with informants, suspects, and confirmed narcotics traffickers concerning the

methods and practices of drug traffickers, including the methods and practices used by traffickers, in particular those moving methamphetamine, heroin, and cocaine. Additionally, I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices. The investigations I have worked have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations.

3.     The facts in this affidavit come from my personal observations, training and experience, and information obtained from other law enforcement personnel and civilian witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter.

C.     Identification of the Property to be Searched

a.     TARGET ADDRESS 1 is 1370 Glenwood Road, Kernersville, North Carolina. TARGET ADDRESS 1 is a single-family brick residence with white trim. The residence is located on the west side of Glenwood Road, north of Glen Hollow Road and south of Ray Street.

b.     TARGET ADDRESS 2 is 44 Wendy Court, Kernersville, North Carolina.  TARGET ADDRESS 2 is a single-family brick residence with white and tan trim. The residence is located on the west side of Wendy Court.

D.     Sources of Information

4.     The facts in this affidavit come from information obtained in part from various law enforcement agencies, databases, related investigations, witness interviews, recordings.

5.     This affidavit is submitted in support of a warrant to authorize the search of properties described in Attachment A, which may constitute and contain records, fruits, instrumentalities, U.S. Currency and evidence of offenses involving violations of federal drug trafficking crimes including possession with intent to distribute a controlled substance, in violation of 21 USC 841; conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and unlawful use of a communications facility to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b), as well as  money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

## II. THE INVESTIGATION

6.     The Roanoke (Virginia) Resident Office of the DEA, in
conjunction with the Henry County (Virginia) Sheriff's Office, have been
conducting a long-term investigation into the drug trafficking activities of
Waylon Allen Cox-Ingram ("Waylon"). As far back as 2021, Waylon has been
known to law enforcement to be a kilogram-level distributor of cocaine,
heroin, and methamphetamine, who employs members of his family to
facilitate the drug trafficking and related money laundering. This
investigation has revealed that Waylon conducts much of his drug trafficking
activities in Henry County, Virginia, and family members are used to
transport drug proceeds in the form of cash from Waylon and/or his
associates to one of several family residences in North Carolina for
safekeeping—the TARGET ADDRESSES.

7.     In 2021, a State of Virginia residential search warrant was
executed at Waylon's girlfriend's home during which investigators seized a
kilogram of heroin, approximately one-half pound of methamphetamine,
$64,000 in cash and multiple firearms. Follow-up interviews indicated that
the $64,000 represented a single day's proceeds from Waylon's drug
trafficking operation. Waylon's girlfriend initially confessed to the possession
of the seized drugs and was subsequently convicted in state court. However,

later during private interviews with law enforcement, to include the Henry County Sheriff's Office, she conceded she was covering for Waylon and that he offered to pay her and provide her with an attorney in exchange for the confession.

8.      Additionally, throughout 2021-2022, investigators conducted numerous controlled drug purchases, via confidential sources, from Waylon, including the purchase of one pound of methamphetamine and multiple ounce cocaine purchases.

9.      Investigators have interviewed numerous associates of Waylon's, including his former drug customers and business partners. These interviews corroborated the hands-on role of family members in Waylon's organization. In particular, Waylon's mother, Endy Cox-Ingram ("Endy") and sister, Victoria Ingram-Windley ("Victoria").

10.      According to law enforcement surveillance, law enforcement indices, motor vehicle registration information, and public records, TARGET ADDRESS 1 is occupied by Endy.

11.      According to law enforcement surveillance, motor vehicle registration information, and public records (including property deeds) TARGET ADDRESS 2 is occupied by Victoria.  Law enforcement is also aware, based on surveillance, that Traylon Allen Ingram, Waylon's son, resides at TARGET ADDRESS 2.

12.    During interviews since 2021, at least three separate individuals, with close knowledge of the organization, identified Endy as being involved in drug trafficking, stating that she controls the cash for the organization. Multiple individuals have informed police that Waylon uses safes to store drugs and drug proceeds, and that those safes are kept in the residences of family members and/or associates. In particular, Endy (TARGET ADDRESS 1) and Victoria (TARGET ADDRESS 2) have been identified by witnesses as being involved in the storage of drugs and/or money.

13.    In 2022, law enforcement interviewed a former associate of Waylon's. (hereafter referred to as Source of Information 1, "SOI 1"). SOI 1 stated the he/she was involved with the distribution of drugs with Waylon. SOI 1 stated that he/she helped package drugs and money (drug proceeds) for Waylon. SOI 1 stated that the drug proceeds were picked-up by Endy once or twice a week and taken into North Carolina for safekeeping. In particular, SOI 1's understanding is that drug proceeds were kept at Endy's residence, TARGET ADDRESS 1, in a large safe.

14.    In 2022, law enforcement interviewed a criminal associate of Waylon who was cooperating at the time (hereafter referred to as Source of Information 2, "SOI 2"). SOI 2 stated that he/she had physically seen Waylon with large amounts of drug proceeds on several occasions. According to SOI 2, on one such occasion, he/she saw Waylon give what SOI 2 estimated to be

approximately $100,000 in cash to an young man Waylon identified as his son. The witness heard Waylon instruct the young man to take the money to his "grandmother" with instructions to store it in the designated place. Law enforcement's interpretation of this anecdote is that SOI 2 saw Waylon hand drug proceeds to his 19-year-old son, Traylon Allen Ingram ("Traylon"), with instruction to provide said proceeds to Endy.

15.    On July 29, 2023, Waylon and his wife, Patricia Beth Cox-Ingram ("Beth"), were arrested in Henry County, Virginia. Waylon and Beth were each charged with possession of cocaine after their involvement in a traffic accident. Waylon was also charged with assaulting a Henry County deputy during the incident. Since his incarceration, Waylon has been using the in-house jail telephone system to communicate with members of his family and his organization.  The in-house telephone system is monitored and recorded, and inmates are alerted during each call that the conversation is being recorded.  Inmates are provided an account and instructed to access their accounts to make outgoing calls.  In my experience, it is common practice among inmates to use other inmate's accounts to make outgoing calls to either access funds in the other inmate's account or to hide the calls from law enforcement.  Since his incarceration, law enforcement has monitored Waylon's use of both his account and the accounts of other inmates to make outgoing calls.

16.     Based on training, experience, and knowledge of this investigation, it is my understanding that, since his arrest, Waylon has directed, whether directly or indirectly, Traylon, to facilitate drug trafficking operations by making pick-ups and deliveries of cash drug proceeds between Virginia and North Carolina. For example, the following calls occurred beginning in August, 2023:

a.     On August 9th, 2023, during a conversation with Endy, Waylon referred to Traylon as "the bank." I understand this to mean Waylon was informing Endy that Traylon would be handling the money for the organization.

b.     On August 11th, 2023, Waylon instructed Endy to contact Traylon and have him "come up" and take "it" back as usual. Waylon then told Endy that "it" should be a "quarter." I understand this conversation to mean Waylon, through Endy, ordered Traylon to travel from Kernersville, North Carolina to Waylon's residence, 425 Tanglewood Road, Martinsville, Virginia, to pick-up a "quarter", or $25,000, in drug proceeds and take the proceeds to a family residence in Kernersville to be secured in a safe.

c.     On August 12th, 2023, Waylon spoke directly with Traylon and asked him how much money he had "down there?" Traylon responded by referencing having money sent to "the app." Waylon then

instructed Traylon to take all the money and put it in "his" and put that one into the other one. My understanding of this conversation is that Waylon and Traylon were discussing the use of "the app" or CashApp. This is consistent with law enforcement's knowledge that Waylon historically and routinely uses CashApp to transfer money with his drug customers. Furthermore, I understand this conversation to mean Waylon directed Traylon to put money into a safe and place that safe into a larger safe. As discussed above, law Enforcement is aware that Waylon employs multiple safes placed in the homes of family members to secure drug proceeds and that these family members have access to these safes.

     d.    On August 12th, 2023, Waylon told Endy that "Sam" dropped off "14." Waylon then asked Endy if she had contacted Traylon. Endy responded, "he didn't answer yet." I understand this conversation to be Waylon informing Endy that, "Sam", know to law enforcement as Waylon's associate Quincy Leon Penn, had left $14,000, at Waylon's residence in Martinsville, Virginia. Further, Waylon requested Endy inform Traylon, so that Traylon would retrieve the drug proceeds and take them back to Kernersville, North Carolina for safekeeping.

17.     On September 24th, Waylon told Beth to get "mini me" to "throw her two" but that she "will have to go get it." I understand this to mean that Waylon, via Beth, instructed Traylon, or "mini me", to provide Waylon's associate, Brittany Dodson, with $2,000. Waylon's instruction to have Brittany Dodson "go get it" references the money being located at TARGET ADDRESS 2. Law enforcement is aware, based on surveillance of Traylon, that he resides at TARGET ADDRESS 2. The vehicle utilized by Traylon is also registered to TARGET ADDRESS 2. As recently as September 30, 2023, law enforcement has seen the vehicle known to be utilized by Traylon at TARGET ADDRESS 2.

18.     On September 15, 2023, Beth was released from the Henry County Jail on a secured bond. Upon Beth's release, law enforcement noted that the monitored jails calls regarding the movement of drug proceeds slowed significantly. Additionally, Beth was fitted with a GPS tracking device as a condition of her release. Law enforcement has the ability to monitor the movement of this device. A review of the data shows that Beth has traveled to both TARGET ADDRESS 1 and 2 on several occasions since her release, including as recently as September 29, 2023. Based on the history of this investigation and the relationship of Waylon and Beth, law enforcement's understanding is that, Beth has either resumed or taken over the responsibility for the movement of money into North Carolina and, therefore,

Waylon no longer needs to provide the regular instruction as he did for Traylon

19. On September 18, 2023, a Henry County Grand Jury indicted ten individuals, including Waylon, Beth, Traylon, Endy and Victoria for money laundering and racketeering in relation to this drug trafficking investigation.

20. On October 3, 2023, law enforcement executed eight separate State of Virginia search warrants for locations within Henry County, Virginia, related to this investigation. These residences were located in the Western District of Virginia. During the course of these arrests and search warrants, law enforcement interviewed a cooperating defendant ("CD 1") who provided a statement against his/her own penal interest. Law enforcement are aware, based on this investigation, that CD 1 has close ties to members of the organization and has been directly involved in activities in furtherance of the organization's drug and money laundering. CD 1 stated that he/she is aware that Beth is currently transporting drug proceeds on behalf of the organization. Furthermore, CD 1 stated that he/she provided drug proceeds directly to Beth as recently as September 29, 2023. CD 1 stated that he/she has done this directly or witnessed drug proceeds being provided to Beth on several occasions in the past few weeks.

21. Law enforcement's understanding is CD 1's statement coupled with Beth's movements to/from North Carolina, show that Beth is

transporting drug proceeds to TARGET ADDRESS 1 and 2 in furtherance of the organization's drug trafficking activities.

22.     Based on the aforementioned, including the ongoing investigation, witness statements, law enforcement surveillance, and controlled drug buys, your affiant respectfully submits that there is probable cause to believe that Waylon and other co-conspirators have violated Title 21, United States Code, Section 841, to wit: distribution of cocaine, methamphetamine and heroin, which are controlled substances, that Waylon and co-conspirators have violated Title 21, United States Code, Section 846, to wit: conspiracy to distribute controlled substances, and Title 18, United States Code, Section 1956(h) to wit: conspiracy to launder money; and that drugs, currency, documentation, and other items related to the illegal activities will be located at TARGET ADDRESS 1 and TARGET ADDRESS 2.

23.     Based upon my training, expertise, and experience, I know that:

a. Distributors of controlled substances and money launderers often keep ledger books, telephone books, receipts, drug/money customer lists, photographs and other papers that identify co-conspirators and their locations or residences and that relate to the importation, transportation, purchasing and distribution of controlled substances and proceeds

derived from said sales;

b. Drug traffickers generate substantial profits because of drug dealing which the courts have recognized as probative evidence of crimes motivated by greed, in particular, trafficking controlled substances. Drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement agencies. These assets often are placed in other person's names, even though the drug dealers continue to use these assets and exercise dominion and control over them. They also often maintain on hand large amounts of United States currency in order to operate and finance their ongoing drug business;

c. Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them. It is common practice for large-scale drug dealers to conceal contraband, proceeds and drug sales and records of drug transactions in secure locations within their residences, stash houses, and/or places of business for ready access and to conceal such items from law enforcement authorities. Persons

involved in large scale drug trafficking often conceal in their residences, stash houses, and/or places of business, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

d. When drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits. To accomplish this, drug traffickers may utilize, but are not limited to, domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks and money drafts;

e. It is common practice for large-scale drug traffickers to travel to their source and distribution points to facilitate their trafficking. After purchasing their drugs, drug traffickers often transport or cause to be transported their drugs to areas in which they will distribute them. The methods of transportation include, but are not limited to, commercial carriers, private airplanes, ocean going motor vessels, rental

or private automobiles, and government or contract mail carriers;

f. Drug traffickers commonly cause to be taken photographs of themselves, their associates, their property and items used in the distribution of controlled substances. These traffickers usually maintain these photographs at their residences or places of business;

g. Narcotics traffickers use safes, surreptitious compartments and money counting machines to count and store the profits of their narcotics business;

h. Narcotics traffickers commonly possess at their residences, stash houses, or places of business, drugs, paraphernalia, and materials for packaging, cutting, weighing and distributing heroin, including, but not limited to scales, plastic wrap, plastic baggies, paper slips, tin foil, stamp pads, stamp ink and various cutting agents;

i. Drug traffickers commonly use electronic devices and storage components including, but not limited to, cellular telephones, computers, telex machines, facsimile machines, currency counting machines, telephone answering machines, computer software, tapes, discs, CD, DVDs, and audio tapes to store

records of drug sales, ledgers, supplier's/customer's contact

information, financial records, images, audio/video recordings

and other related documents related to the trafficking and

sale of narcotics;

24.    Based on the aforementioned, your affiant respectfully submits

that there is probable cause to believe that U.S. Currency, documentation,

and/or other items related to the illegal distribution of narcotics further

described in Attachment B will be located at TARGET ADDRESS 1 and

TARGET ADDRESS 2.


## III. CONCLUSION

25.    I submit that this affidavit supports probable cause for a search

warrant of the properties described in Attachment A, in order to seek the

items described in Attachment B.


## IV. OATH

26.    The information in this affidavit is true to the best of my

knowledge and belief.

Respectfully submitted,

/s/ **Bradley Smith**

Bradley Smith, Special Agent

Drug Enforcement Administration

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the

contents of this Affidavit, which was submitted to me by reliable electronic

means, on this __3__ day of __October__, 2023, at __9:16__ a.m./p.m.

JOI E. PEAKE

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Place and Property to be Searched

The property to be searched is:

TARGET ADDRESS 1 is **1370 Glenwood Road, Kernersville, North Carolina**. TARGET ADDRESS 1 is a single family brick residence with white trim.  The residence is located on the west side of Glenwood Road, north of Glen Hollow Road and south of Ray Street.

Below is a photograph of TARGET ADDRESS 1:



<u>**ATTACHMENT A**</u>

**Place and Property to be Searched**

The property to be searched is:

TARGET ADDRESS 2 is **44 Wendy Court, Kernersville, North Carolina.**
TARGET ADDRESS 2 is a single family brick residence with tan and white
trim. The residence is located on the west side of Wendy Court.

Below is a photo of TARGET ADDRESS 2:



This warrant is to search the residence described herein and all outbuildings on or within the curtilage of the property.

# ATTACHMENT B
## Property to be Seized

1. All records relating to violations of distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and conspiracy to launder money, in violation of 18 U.S.C. 1956 and 1957, those violations involving Waylon COX-INGRAM and his co-conspirators, including:

    a. Books, records, receipts, notes, ledgers, and other papers relating to the transporting, ordering, purchasing, and distributing of controlled substances;

    b. Books, records, invoices, receipts, records of real estate transactions (whether rented or owned property), safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealing, and/or expending of money;

    c. Photographs, including still photographs, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of coconspirators, assets, and/or controlled substances;

    d. Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax machines, and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

    e. Indicia of occupancy, residency, rental, and/or ownership of the premises to be searched, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase, or lease agreements, and keys;

    f. Lists of customers and related identifying information;

    g. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    h. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    i. Any information relating to the schedule or travel of members of the organization;

    j. All bank records, checks, credit card bills, account information, and other financial records;

    k. Records and information relating to the identity or location of the suspects;

l. United States currency, precious metals, jewelry, and financial instruments, including stocks and bonds;

m. Controlled substances including but not limited to cocaine, crack cocaine and heroin and methamphetamine;

n. Scales, containers, mixers, cutting tools, packaging materials, beaters, burners, and any other drug paraphernalia used in manufacturing, diluting, packaging, and distributing controlled substances;

o. Firearms and other items pertaining to the possession of firearms, including gun cases, ammunition, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or of persons in possession of firearms, and receipts for the purchase and/or repair of all these items;

p. Books, records, invoices, receipts, records of real estate transactions (whether rented or owned property), bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, and cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealing, and/or expending of money;

q. Electronic equipment, such as computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines (including listening to any messages recorded on such machines). Additionally, computer software, tapes, discs, CD, DVDs, audio tapes, and the contents therein, containing the information generated by the aforementioned electronic equipment.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, tablets, server computers, and network hardware. Mobile telephones may be seized but would require a separate warrant to search.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.